IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HEATHER DELHAGEN,                          :
                                           :
              Plaintiff                    :     3:08-CV-285
                                           :
         v.                                :     JUDGE VANASKIE
                                           :
KEN McDOWELL, Individually and             :
in his Official Capacity,                  :
                                           :
              Defendant                    :
                                           :

MEMORANDUM

Plaintiff Heather Delhagen is the former audit supervisor for the Lackawanna County

Controller's Office.  Delhagen was fired from this position on January 7, 2008 by Defendant

Ken McDowell, the same day that McDowell was sworn into office as the Lackawanna County

Controller.  Delhagen filed this civil rights case alleging that McDowell's actions violated her

rights protected by the First and Fourteenth Amendments to the United States Constitution.

Before the Court is McDowell's motion for summary judgment.  (Dkt. Entry 21).[1]  For the

reasons that follow, McDowell's motion will be granted in part and denied in part.

_____

[1]  For the convenience of the reader of this Order in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted.  The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

I.     Background

      A.     Facts

      In June of 2005, Heather Delhagen began working as audit supervisor in the Lackawanna County Controller's Office under then-Controller John Mellow.  Her job was to perform audits of various Lackawanna County agencies as determined by Mellow.  Delhagen had no say over which offices were audited, and, despite her title, performed no supervisory responsibilities in the office.  (Heather Delhagen Dep., Dkt. Entry 23-2 at 34-35.)[2]

      In January of 2007, Delhagen was directed by then-Controller Mellow to audit the Single Tax Office.  (Id. at 48.)  At the time of the audit, Defendant Ken McDowell was the elected tax collector in charge of the Single Tax Office, and had announced that he was a candidate for the office of Controller in the Democratic primary election, which made him an opponent of then-Controller Mellow, also a Democrat.

      When the audit began, Delhagen had a meeting with McDowell to inform him of how the audit would be conducted.  Delhagen testified at her deposition that McDowell was not happy that she was there, and McDowell stated "it was ironic that [Delhagen] should be there

---

[2]Due to the manner in which documents were filed in this case, all page citations in this Memorandum to deposition testimony refer to the pagination contained in the deposition transcript rather than the pagination of the docket entry.  All other page citations (non-deposition) refer to the pagination of the docket entry rather than the document's pagination.

to audit him at a time that he was running against [her] boss." (Id. at 49:10-11.)  The audit of

the Single Tax Office lasted more than six months.  At the end of the audit, Delhagen

prepared an audit report, (Audit, Dkt. Entry 23-3 at 6-27), and presented it at an exit

conference on July 27, 2007.

Defendant McDowell, his attorney Dave Rinaldi, then-Controller Mellow, as well as

others were at the exit conference.  Delhagen presented the findings and recommendations of

the audit.  The audit discovered almost $368,000 in overpayments were being held by the

Single Tax Office dating as far back at 1998.  (Id. at 14-16; Sep. 3, 2007 article in Scranton

Times-Tribune, Dkt. Entry 23-3 at 56-57.)  According to Delhagen, McDowell appeared

frustrated during the conference, and stated rhetorically, "[w]ell, when I'm Controller," which

Delhagen took to mean that he did not like the findings of the audit.  (Delhagen Dep., Dkt.

Entry 23-2 at 57.)  However, she acknowledged in her deposition that she does not know how

McDowell felt about the audit.  (Id. at  72.)

The audit of the Single Tax Office attracted significant local media attention.  At least

five articles appeared in the Scranton Times-Tribune, three of which either quoted or

attributed information to Delhagen.  (See Scranton Times Tribune articles, Dkt. Entry 23-3 at

54-61.)  Delhagen testified at her deposition that she spoke to reporters from the Scranton

Times-Tribune on only one occasion, and then only at the request of then-Controller Mellow.

(Delhagen Dep., Dkt. Entry 23-2 at 163.)  Three of the five articles appeared in the newspaper prior to McDowell's election as Controller and Delhagen's termination.  All of the articles were critical of the Single Tax Office.

Other than his comments at the beginning and end of the audit, McDowell did not say anything to Delhagen that she interpreted negatively.  (Delhagen Dep., Dkt. Entry 23-2 at 62.) McDowell never asked Delhagen about her political affiliation or associations.  (Id. at 63-64.) At her deposition, Delhagen stated that she supported then-Controller Mellow by changing her voter registration from Republican to Democrat so that she could vote for him in the primary election.  (Id. at 74.)  She did not work on Mellow's campaign, but may have had a sign supporting him in her front yard.  (Id. at 75.)  Other than this, however, she stated that she "[does not] get involved with politics."  (Id. at 75:7.)

McDowell was elected Controller in November 2007, and assumed the office on January 7, 2008.  On that same day, he instructed the solicitor to meet with Delhagen and two other employees of the Controller's office – Jack Malos, then-deputy controller and Mike Shumek, then-office manager – "and inform them that they would no longer be employees of the [C]ontroller's [O]ffice."  (Ken McDowell Dep., Dkt. Entry 25-7 at 7:12-13.)  Neither McDowell nor anyone from his staff ever met with Delhagen to discuss her duties or management philosophy.  (Id. at 7-8.)  McDowell testified that he made the decision to

4

terminate the employment of these individuals because "he wanted to bring in a new management team." (Id. at 8:6-7.)

McDowell testified that he made the decision to replace Delhagen because her "position of audit supervisor would perform supervisory duties and be part of the management team," (id. at 23:23-25), and that during the campaign he had made a decision "that it was time for a new direction in the [C]ontroller's [O]ffice and a new management team." (Id. at 23:10-12.) McDowell testified at his deposition that he does not know "one way or the other" whether Delhagen was a supporter of his campaign for Controller. (Id. at 31:8.)

McDowell hired replacements for each of the individuals whom he terminated. McDowell testified at his deposition that he instructed his transition team to place blind advertisements in the Scranton Times-Tribune. (Id. at 9.) Both members of his transition team were actively involved in his campaign for Controller. Specifically, the transition team selected his deputy controller. (Id.) Once that person was hired, he selected the person hired to replace Delhagen from the top three people in consideration for the position. (Id.) McDowell testified that he did not meet with any of the individuals before they were selected. (Id.) The interviews and selections for these positions occurred in December of 2007, one month before McDowell took office. (Id. at 12.)

5

Ultimately, Andrew Marichak was chosen to replace Delhagen as audit supervisor. He was an acquaintance of McDowell, but he was not a part of McDowell's campaign and McDowell is unaware of whether Marichak supported him. (Id. at 9-10.) Marichak and his family own a bar called "E Street" that McDowell frequented both before and after he became Controller. (Id. at 71.) While patronizing "E Street," McDowell would have conversations with Marichak while Marichak bartended, although the record is devoid of any indication about either the frequency or content of these conversations. Marichak began his employment as audit supervisor on January 8, 2008 – one day after McDowell took office and Delhagen was fired. (Id. at 12.)

Following her termination, Delhagen received a letter from the Controller's solicitor. The body of the letter stated:

> This letter will confirm our conversation this morning in which you were informed that you were being separated from employment at the Lackawanna County Controller's Office as of the close of business today. I want to once again apologize for the short notice you were given but the former Controller refused to allow contact with you while he remained in office.
>
> I want to thank you for your dedication during your years of service to Lackawanna County Government and its citizens. I want to restate that your separation is not for cause but rather because the new administration desires to have the supervisory and management positions held by individuals with which the Controller is familiar and who share his management philosophy. As you can appreciate the position you formerly held is responsible for setting office policy, confidential communications and staff management.

6

(Jan. 7, 2008 Ltr. from David Rinaldi, Esq. to Heather Delhagen, Dkt. Entry 25-2.)

When asked during his deposition what office policies Delhagen set, McDowell stated that he "could not say . . . one way or the other" whether she set policy or not.  (McDowell Dep., Dkt. Entry 25-7 at 35:23-24.)  When asked what confidential communications that Delhagen handled while at the Controller's office, McDowell could not be any more specific than that she "would come across information of a confidential nature."  (Id. at 43.)

 For her part, Delhagen testified at her deposition that her position was not supervisory and that she did not believe that she had to be politically affiliated with her boss in order to perform her job.  (Delhagen Dep., Dkt Entry 23-2 at 163-64, 166.)  Furthermore, Delhagen testified that she did not have any say in who was audited, but that she simply audited those agencies that she was instructed to audit by then-Controller Mellow.  (Id. at 35.)

While employed at the Controller's Office, Delhagen was a member of the union and paid union dues.  (Id. at 88.)  After she was terminated, Delhagen contacted her union steward, Debbie Langman, and requested that she file a grievance.  (Id.)  On January 10, 2008, Langman filed a grievance for Delhagen.  Specifically, Langman complained that Delhagen was not given bumping rights, was not given a written notice of the reasons for her termination at the time of her discharge, was fired without cause, and was denied the

opportunity to have her union representative present at the time of her termination.  (See

SEIU 668 General Grievance form, Dkt. Entry 25-3.)

On February 20, 2008, Lackawanna County responded to Delhagen's grievance as

follows:

> With regard to the grievance on behalf of Ms. Delhagen, as Audit Supervisor,
> her position is . . . outside the scope of the certified bargaining unit, and,
> therefore, the grievance is not substantively arbitrable.  In any event, even if the
> grievant has standing, the County fully complied with all provisions of the labor
> contract, including Article 9 and Article 23.  Ms. Delhagen's position was
> eliminated and as such she was laid off in accordance with seniority.  As the
> least senior employee in the Controller's Office, Ms. Delhagen lacks any
> bumping rights under the labor contract.

(Feb. 20, 2008 Ltr. from M. Elkins to J. Yanchulis, Dkt. Entry 25-4 at 1.)[3]  It is unclear from the

record what happened with this grievance, except that on July 6, 2009, counsel for Delhagen

sent a letter to the union requesting that the union continue to pursue the grievance.  (See Jul.

6, 2009 Ltr. from C. Pollick to K. Yost, Dkt. Entry 23-4.)  In her deposition, Delhagen testified

that she is "in arbitration," but that she does not have a date for the arbitration hearing.

(Delhagen Dep., Dkt. Entry 23-2 at 90:21; 102.)

---

[3]The record is unclear why Lackawanna County took the position on February 20, 2008,
that Delhagen's position was unfilled given that Marichak was hired to replace Delhagen.  There is
nothing in the record indicating that Marichak no longer works for the County.

For his part, McDowell testified that he was not aware that Delhagen was a member of the union until his transition team heard this when they terminated her employment. (McDowell Dep., Dkt. Entry 25-7 at 46.)  When he received Delhagen's grievance, he consulted his solicitor and determined that Delhagen's position was a management position that was not entitled to the protection afforded in the collective bargaining agreement.  (Id. at 48.)

Delhagen testified in her deposition that she believes that she was terminated because she supported then-Controller Mellow and followed through with the audit of the Single Tax Office.  (Delhagen Dep., Dkt. Entry 23-2 at 80.)   After being terminated, Delhagen collected unemployment compensation until May of 2008, when she was hired by Kraft Foods as an accounts receivables associate.  (Id., at 11-12.)

B.      Procedural History

Delhagen filed her Complaint and then an Amended Complaint on February 14, 2008. (Dkt. Entries 1, 2.)  After discovery, McDowell filed his motion for summary judgment, statement of material facts, and exhibits on August 3, 2009, (Dkt. Entry 21), and filed a supporting brief on August 17, 2009. (Dkt. Entry 24.)  Delhagen filed her brief in opposition, exhibits, and counter-statement of material facts on September 1, 2009.  (Dkt. Entries 25-26.)

McDowell filed a reply brief on September 16, 2009.  (Dkt. Entry 28.)  The motion is now ripe for disposition.

II.     Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party.  Id. at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana, 260 F.3d at 232; see also Reeder v. Sybron Transition Corp., 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving party may not

simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotations omitted); see also Saldana, 260 F.3d at 232 (citations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." Celotex, 477 U.S. at 322-23.  " 'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' " Saldana, 260 F.3d at 232 (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)).

III.    Discussion

Plaintiff brings her claims pursuant to 42 U.S.C. § 1983, which states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." City of Monterey v. Del Monte Dunes, 526 U.S. 687, 749 n. 9 (1999) (internal quotation omitted).  To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or the laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000); Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993).  The parties do not dispute that at all relevant times McDowell was acting under color of state law.

In her complaint, Delhagen asserts that her firing violates her rights under the First and Fourteenth Amendments to the United States Constitution.  Specifically, Delhagen believes that her termination violates the First Amendment because it was improperly motivated by political reasons.  (Amended Complaint, Count I.) She further claims that her procedural due process rights were violated because she never received notice of the grounds for her discharge or an opportunity to be heard before being fired.  (Amended Complaint, Count II.) She has also asserted a "failure to train claim against McDowell in his official capacity." (Amended Complaint, Count III).  Each claim will be assessed separately.

A.      First Amendment Claim

It is well established that the First Amendment protects public employees from politically motived termination unless "party affiliation is an appropriate requirement for the effective performance of the public office." Branti v. Finkel, 445 U.S. 507, 518 (1980); see also, Rutan v. Repulican Party of Ill., 497 U.S. 62 (1990); Elrod v. Burns, 427 U.S. 347 (1976). From this general principle, the Third Circuit Court of Appeals has developed a three-part test to establish a claim of wrongful discharge based on political patronage in violation of the First Amendment.  To make out a *prima facie* case, Delhagen must show that "(1) she was employed at a public agency that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007) (citing Stephens v. Kerrigan, 122 F.3d 171, 176 (3d Cir. 1997)).  Even if a plaintiff satisfies these elements, the employer may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." Stephens, 122 F.3d at 176.

Here, Delhagen asserts that she was terminated from her employment because she was a supporter of McDowell's predecessor, and because she conducted an audit that found serious problems with the way the Single Tax Office was run while McDowell was in charge of

13

that office.  The parties vigorously dispute whether Delhagen has come forward with sufficient

evidence to sustain a *prima facie* case.

    1.  Political affiliation as a requirement for the
       position of audit supervisor

A plaintiff must "show that she works in a position that does not require political

affiliation." Galli, 490 F.3d at 271. "This burden of proof shifts to the government if it claims to

have properly discharged an employee because political affiliation is central to the job itself."

Id.  The crux of the analysis is whether the position at issue is a "policymaking" position; if so,

then political patronage is permitted.  Elrod, 427 U.S. at 367.

Of course, whether a position is a policymaking position is fact specific.  The Third

Circuit has set out several factors for a district court to consider.  Specifically, this Court is

charged with looking at:

> [W]hether the employee [1] has duties that are non-discretionary or non-
> technical; [2] participates in discussions or other meetings; [3] prepares
> budgets; [4] possesses the authority to hire and fire other employees; [5] has a
> high salary; [6] retains power over others; [7] and can speak in the name of
> policy makers.

Brown v. Trench, 787 F.2d 167, 169 (3d Cir. 1986).  In summarizing these factors, the Third

Circuit in Galli stated that "[t]he key factors seems to be not whether the employee was a

supervisor or had a great deal of responsibility[,] but whether [she] has meaningful input into

decision making concerning the nature and scope of a major [ ] program." Galli, 490 F.3d at

271 (alterations in original) (citing Armour v. County of Beaver, Pa., 271 F.3d 417, 429 (3d Cir. 2001)).

Although resolution of the issue is not free from doubt, Delhagen has come forward with sufficient evidence to persuade a reasonable jury that her position as audit supervisor was not a policymaking position.  Delhagen testified at her deposition that, despite the title of her job, she had no supervisory role in the office, (Delhagen Dep., Dkt. Entry 23-2 at 163-64), she played no role in selecting which county agencies to audit, (id. at 30:21-23; 35:7-10), she did not possess the authority to hire or fire others, (id), and she was paid a modest salary of $30,800. (Id. at 23.)

McDowell focuses much attention on the fact that Delhagen was quoted in numerous newspaper articles in the Scranton Times-Tribune concerning the audit of the Single Tax Office as proof that she frequently spoke in the name of the Controller's Office.  However, the facts are not so clear.  While she was quoted in a series of articles, Delhagen testified at her deposition that she spoke to reporters only one time, and then only at the request of then-Controller Mellow while in his presence.  (Delhagen Dep., Dkt Entry 23-2 at 128, 163). Furthermore, it is unclear from the content of some of the articles whether the Scranton Times-Tribune was getting its information from an interview with Delhagen or from the audit report which bears her name.

McDowell also points to the fact that Delhagen prepared the audits for the office, and conducted the meetings where the audit report was presented.  It is true that audits were prepared by Delhagen and that she had considerable leeway in determining how to conduct an audit of any given agency.  (Delhagen Dep., Dkt. Entry 23-2 at 30-31.)  However, the Controller determined what audits were to be conducted, and ultimately approved all audits. (Id. at 31.)  While there is some evidence that Delhagen had discretion about the methodology of the audits, there is no evidence suggesting that Delhagen determined which agencies were audited or the scope of the audits once the agencies were chosen.

Based on a review of the record, drawing all inferences in favor of Delhagen as the court must do in deciding McDowell's motion for summary judgment, the Court concludes that Delhagen has satisfied her burden of coming forward with evidence that, if believed, could lead a reasonable jury to conclude that she did not occupy a policymaking position in the Controller's Office.  See Galli, 490 F.3d at 272 (concluding that plaintiff had presented sufficient evidence that "political affiliation was not a requirement for her position sufficient to defeat summary judgment").

### 2.  Constitutionally Protected Conduct

The second hurdle for a *prima facie* political patronage claim is for Delhagen to show that "she engaged in constitutionally protected conduct."  Stephens, 122 F.3d at 176.  This

prong is broad enough to encompass both the politically active and the apolitical employee.  In other words, "the right not to have allegiance to [an] official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party." Galli, 490 F.3d at 272.  Most relevant here, "the First Amendment protects an employee's failure to engage in any political activity whatsoever." Id., at 273.

Neither Delhagen nor McDowell pay much attention in their respective briefs to this prong of the test.  Nonetheless, the record is clear that Delhagen was not politically active.  She stated that she "[does not] get involved in politics," (Delhagen Dep., Dkt. Entry 23-2 at 75), and that nothing about her job required that she be involved with politics.  (Id. at 165).  There is some evidence that Delhagen supported McDowell's opponent, albeit in ways that were not particularly visible.  For instance, she testified that she changed her voter registration from Republican to Democrat so that she could vote in the primary election for Mellow and against McDowell.  (Id. at 74.)  She may also have had a sign in her yard supporting Mellow.  (Id. at 75.)  Apparently, this is as far as Delhagen went in voicing her support for either candidate.  She did not attend any campaign rallies, she did not donate to a campaign, and she did not have a bumper sticker on the back of her car.  (Id. at 76.)

Thus, Delhagen has submitted some evidence that she did not politically support McDowell for his election to the Controller's Office.  Whether her failure to support is evidenced by a decision to support a competing candidate or by a decision to be apolitical and support no candidate is of no importance as both are constitutionally protected.  Thus, Delhagen has come forward with sufficient facts from which a reasonable jury could conclude that she engaged in constitutionally protected activity.

### 3.  Substantial or Motivating Factor

Lastly, Delhagen must establish that her constitutionally protected conduct was a "substantial or motivating factor" in McDowell's decision to terminate her employment with the Controller's Office.  Galli, 490 F.3d at 275.  " 'Implicit in th[is] prong is the requirement that the plaintiff produce sufficient evidence to show [that] the defendant knew of [the] plaintiff's political persuasion,' which requires proof of both knowledge and causation." Id. (alterations in original) (citing Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 664 (3d Cir. 2002)). Thus, Delhagen must produce evidence from which a reasonable jury could infer that McDowell knew she was not his supporter and that he fired her as a result.  Id.  Of course, like all evidence, proof of knowledge and causation can come from either direct or circumstantial evidence.  See Goodman, 293 F.3d at 664.

a.  Knowledge

Here, McDowell argues that the undisputed facts demonstrate that he was not aware of Delhagen's political affiliation or her support for Mellow.  Specifically, while she audited the Single Tax Office, McDowell never asked about Delhagen's political affiliation or who she associated with politically.  (Delhagen Dep., Dkt. Entry 23-2 at 63-64.)  Furthermore, McDowell stated in his deposition that he does not know whether Delhagen supported him. (McDowell Dep., Dkt. Entry 25-7 at 31.)

For her part, Delhagen argues that there is sufficient evidence that McDowell was aware that she was not his supporter.  Specifically, she points to the fact that on the first day of the audit McDowell expressed his displeasure by saying that he found it ironic that his office was being audited when he was running against Mellow for the Controller position, (Delhagen Dep., Dkt Entry 23-2 at 49), and at the end of the audit McDowell again expressed his displeasure and stated, "[w]ell when I'm Controller," (id. at 56-57), which she took to mean that he did not like the findings of the audit.  Delhagen further argues that the fact that she was extensively quoted by the Scranton Times-Tribune in defense of the audit critical of the Single Tax Office and McDowell could lead McDowell to conclude that she was not his supporter.

19

Viewing all of the facts in a light most favorable to Delhagen, the Court concludes that Delhagen has presented sufficient evidence permitting a jury to draw the inference that McDowell knew that she was not a supporter of his candidacy for the Office of Controller. Although such an inference need not be drawn, Plaintiff has presented enough evidence to defeat summary judgment.

### b.  Causation

To demonstrate causation, Delhagen must come forward with some evidence from which a jury could reasonably conclude that McDowell terminated her because she did not support him and his candidacy.  See Galli, 490 F.3d at 276.  McDowell argues that there is absolutely no evidence that he terminated Delhagen because of her lack of support for his candidacy, and points to the fact that Delhagen's successor was also not politically active.

It is true that the record reflects that Delhagen's successor was not a part of McDowell's campaign and did not support McDowell publically.  (McDowell Dep., Dkt. Entry 25-7 at 8-9.)  It is also true that Marichak was chosen not by McDowell himself, but rather by the new deputy controller whom McDowell hired.  (Id. at 9.)  Both of these facts weigh against causation.  However, both the odd timing and circumstances of her termination, and the discharge letter itself militate in Delhagen's favor.

First, it is undisputed that Delhagen was fired within hours of McDowell being sworn in as Controller.  (Id. at 7.)  Furthermore, her replacement was chosen in December 2007– over one month before McDowell took office – and Delhagen was never considered for retention. (Id. at 12, 17.)

Second, Delhagen's termination letter, read in a light most favorable to Delhagen, also supports her causation theory.  That letter, in relevant part, states:

> I want to restate that your separation is not for cause but rather because the new administration desires to have the supervisory and management positions held by individuals with which the Controller is familiar and who share his management philosophy.  As you can appreciate the position you formerly held is responsible for setting office policy, confidential communications and staff management.

(Jan. 7, 2008 Ltr. from David Rinaldi, Esq. to Heather Delhagen, Dkt. Entry 25-2 (emphasis added).)  This language, coupled with the fact that McDowell never discussed his or Delhagen's management philosophy with Delhagen, could legitimately be interpreted as patronage.  This is especially true when the Court considers that while Delhagen's replacement was apparently not intimately involved in McDowell's campaign, he was an acquaintance of McDowell's, and owned a bar that McDowell frequented.  (McDowell Dep., Dkt. Entry 25-7 at 71.)

Standing alone, none of these facts permit the inference that Delhagen was terminated because of her perceived support of Mellow or lack of support for McDowell. When these facts

21

are viewed as a whole, however, and considered in the light most favorable to Delhagen, a

reasonable jury could reach this very conclusion.  Accordingly, summary judgment on the

issue of causation would be premature.

>  4.  First Amendment Summary

The First Amendment protects politically neutral or apolitical government employees

from political patronage discrimination, as well as employees who support an opposing

candidate.  Here, Delhagen has come forward with sufficient evidence to create an issue of

material fact regarding whether she was a policy making employee, as well as whether

McDowell fired her because she did not support his candidacy. Accordingly, the motion for

summary judgment as to Delhagen's First Amendment claim against McDowell in his

individual capacity will be denied.

> B.  Pre-termination Due Process

"To state a claim under § 1983 for deprivation of procedural due process rights, a

plaintiff must allege that (1) he was deprived of an individual interest that is encompassed

within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the

procedures available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown,

455 F.3d 225, 233-34 (3d Cir.2006) (citing Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir.2000)).

In her Amended Complaint, Delhagen claims that she had a constitutionally protected property

interested in continued employment with Lackawanna County.  Specifically, she claims that her position was covered by a collective bargaining agreement requiring just cause before termination of employment.  McDowell, without addressing the threshold question of whether Delhagen had a protected property interest in her employment position, argues that Delhagen's due process claims fail because she was afforded an opportunity to be heard through the post-termination grievance and arbitration process.  Because McDowell takes the position that due process was satisfied by the provisions of the collective bargaining agreement, the court will assume for purposes of deciding this motion that Delhagen had a protected property right in her employment position.[4]

As a general rule, government employees with a protected property interest in their employment must be accorded some opportunity to be heard before the involuntary termination of their employment.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 539 (1985).  In Loudermill, the Supreme Court found that depriving a person of her means of livelihood was severe, and that giving an employee the opportunity to present her side of the case is of obvious value in reaching an accurate decision.  Id. at 543.  The Court next determined that the governmental interest in immediate termination does not outweigh these

---

[4] Of course, absent a protected property interest, due process guarantees are not implicated.

interests, and that "affording the employee an opportunity to respond prior to termination . . . impose[s] neither a significant administrative burden nor [an] intolerable delay[]." Id. at 544. The Court also reasoned that "the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors[,] [and that] [i]t is preferable to keep a qualified employee on than to train a new one." Id.   The Court recognized that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." Id. at 544-45.   Ultimately, the Court held that prior to termination "[t]he tenured public employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." Id. at 545.

The Court recognizes the somewhat unnatural fit in discussing pre-deprivation process when Delhagen was admittedly terminated not-for-cause, and, thus, does not have the same need to rebut the charges against her as would an employee who is terminated based on allegations of wrongdoing.  Nonetheless, the Court believes that this analysis is appropriate in a case such as this.  Here, it is undisputed that no pre-deprivation due process was afforded Delhagen.  It is also clear that had Delhagen been told that she was being let go, and given an opportunity to discuss her termination with McDowell and his staff, it is at least possible that

24

this entire case could have been avoided.  McDowell's stated reason for terminating Delhagen is that she did not share his management philosophy, and that he wanted to be familiar with the individuals who were going to help him set office policy.  Of course, the record reflects that McDowell did not reach out to Delhagen prior to assuming office and immediately fired her once he was sworn in as Controller.  Had McDowell discussed the job with Delhagen, he may very well have learned that she would support him and that she did share his management philosophy.

McDowell argues that Delhagen's due process claim fails as a matter of law because she availed herself of the grievance procedures in the collective bargaining agreement, and this post-deprivation process satisfies the constitution.  In support, McDowell cites the Third Circuit's holdings in Dykes v. Se. Transp. Auth., 68 F.3d 1564 (3d Cir. 1995), and Jackson v. Temple Univ. of Commw. Sys. of Higher Educ., 721 F.2d 931 (3d Cir. 1983).  McDowell's reliance on those cases is misplaced, as neither dealt with an allegation that pre-termination due process was required.

In Solomon v. Phila. Hous. Auth., 143 F. App'x 447 (3d Cir. 2005), our Court of Appeals, albeit in a non-precedential ruling, held that the existence of post-termination grievance proceedings did not preclude a claim based upon the absence of any pre-termination opportunity to be heard where, as here, there was no compelling reason to

25

discharge an employee without being afforded some opportunity to be heard.  The court

explained that "[r]egardless of whether [plaintiff] could have challenged the suspension

through the grievance procedure after he had already been suspended does not remove all

need for basic pre-deprivation . . . process." Id. at 455.  See also Montgomery v. City of

Ardmore,  365 F.3d 926, 937 (10th Cir. 2004) ("Post-termination remedies, no matter how

elaborate, do not relieve the employer of providing the minimal pre-termination procedural

protections noted in Loudermill.")  This Court finds the reasoning in Solomon persuasive, and

will deny summary judgment on the procedural due process claim.

     C.     The Failure to Train Claim against McDowell in his Official Capacity

     In City of Canton v. Harris, the Court held that liability for failure to train government

employees may be imposed only when that failure evidenced "deliberate indifference to the

rights of persons with whom [the municipal employees] come into contact." 489 U.S. 378,

389-90 (1989).  "That a particular officer may be unsatisfactorily trained will not alone suffice

to fasten liability . . . for the officer's shortcomings may have resulted from factors other than a

faulty training program." Id. at 390-91.  A court may properly conclude that a government

official displayed deliberate indifference if (1) "the need for more or different training [was] so

obvious, and the inadequacy so likely to result in the violation of constitutional rights," or (2)

the official had received complaints about the same or similar constitutional violations and still

failed to act. Id. at 390 & n. 10; see also Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (requiring a showing of deliberate indifference for a failure to train claim); Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989) (requiring the plaintiff to demonstrate that the officials had actual knowledge of a certain type of danger because the risk was "so great and so obvious," or that similar types of harms had occurred on previous occasions and officials still failed to respond). The indifference must be "on the part of lawmakers or other officials with the authority to make municipal policy." Simmons v. City of Phila., 947 F.2d 1042, 1059 (3d Cir. 1991).

Here, McDowell agues that Delhagen has come forward with nothing more than "bald, conclusory allegations that Defendant failed to train its employees and agents." (Defs.' Br. in Supp. of Mot. for Summ. J., Dkt. Entry 24 at 12.) Delhagen counters that she has provided sufficient evidence from which a reasonable jury could conclude that McDowell, in his official capacity, was deliberately indifferent to his obligations under the law.

Although there is some evidence in the record that McDowell received no training from Lackawanna County officials, (McDowell Dep., Dkt Entry 25-7 at 78-79), the crux of the matter is not whether McDowell received training but whether the need to train was so obvious, and the inadequacy so great, that it was likely to lead to a constitutional violation if no training occurred, or, in the alternative that a county official had received complaints about the same

27

or similar constitutional violations and still failed to act.  Harris, 489 U.S. at 390.  There are no facts in the record suggesting either of these situations occurred.

Here, McDowell acknowledged in his deposition that he is aware of the fact that "it is illegal to fire someone just for political reasons."  (McDowell Dep., Dkt Entry 25-7 at 53:9-10.) He further acknowledged, at least implicitly, that employees covered by a collective bargaining agreement containing a just cause provision may not be fired without just cause.  (Id. at 46-48.)  Thus, Delhagen's argument, that had McDowell been better trained he would have recognized these principles, is contradicted by the record.

In short, Delhagen has failed to present evidence that a failure to train was the product of deliberate indifference to her rights.  Without this showing, her failure to train claim fails as a matter of law.  Accordingly, McDowell's motion for summary judgment as to Count III of the Amended Complaint will be granted.

D.    Punitive Damages

McDowell argues that Delhagen's request for punitive damages should be dismissed because there are no facts from which a jury could assess these damages.  The Court will not make this decision at this stage.  Since the bulk of Delhagen's case will proceed to trial, the court will defer ruling on whether the issue of punitive damages should be submitted to the jury until the close of all of the evidence in the case.

IV.     Conclusion

       For the foregoing reasons, the court will grant in part and deny in part McDowell's

motion for summary judgment.  McDowell's motion will be granted only as to Delhagen's

failure to train claim, and will be denied in all other respects.  An appropriate order follows.


                                                  s/ Thomas I. Vanaskie
                                                  Thomas I. Vanaskie
                                                  United States District Judge

March 24, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HEATHER DELHAGEN,                              :
                                               :
              Plaintiff                        : 3:08-CV-285
                                               :
              v.                               : JUDGE VANASKIE
                                               :
KEN McDOWELL, Individually and                 :
in his Official Capacity,                      :
                                               :
              Defendant                        :
                                               :

O R D E R

        AND NOW THIS 24th DAY OF MARCH, 2010, for the reasons set forth in

the foregoing Memorandum, IT IS HEREBY ORDERED THAT Defendant's Motion for

Summary Judgment, (Dkt. Entry 21), is GRANTED IN PART AND DENIED IN PART as

follows:

        1.      Defendant's motion is GRANTED as to Count III, Plaintiff's claim against

                Defendant in his official capacity for an alleged failure to train; and,

        2.      Defendant's motion is DENIED in all other respects.

IT IS FURTHER ORDERED THAT the Clerk of Court shall defer entry of judgment on Count III until after trial.  The Court will separately issue a scheduling order establishing the remaining pretrial deadlines and scheduling this matter for trial.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

2